UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,
for the use and benefit of
RAGGHIANTI FOUNDATIONS III, LLC,

     Plaintiff,

v.                      Case No. 8:12-cv-942-T-33MAP

PETER R. BROWN CONSTRUCTION,
INC., ET AL.,

     Defendants.
_____/

## ORDER

    This cause came before the Court for a non-jury trial commencing on February 24, 2014, and concluding on March 4, 2014. On April 23, 2014, the parties timely filed their proposed orders, which included the parties' proposed findings of fact and conclusions of law, (Doc. ## 161, 162, 163), as ordered by the Court at the conclusion of trial.

    Also before the Court is Defendant Peter R. Brown Construction, Inc.'s (PRBC) Motion for Judgment on Partial Findings Pursuant to Fed. R. Civ. P. 52(c) (Doc. # 139), filed on March 4, 2014; PRBC's Motion to Conform the Pleadings to the Evidence (Doc. # 154), filed on April 3, 2014; and Plaintiff Ragghianti Foundations III, LLC's (Ragghianti)

Motion for Judgment on Partial Findings Pursuant to Fed. R. Civ. P. 52(c) (Doc. # 155), filed on April 3, 2014.

Having considered the evidence, applicable law, and the parties' submissions, the Court (1) denies PRBC's Motion to Conform the Pleadings to the Evidence; (2) grants the parties' Motions for Judgment on Partial Findings as set forth herein; and (3) grants judgment in favor of PRBC and against Ragghianti.

The Court's findings of fact and conclusions of law are set forth below pursuant to Fed. R. Civ. P. 52(a).

## I.   Findings of Fact

The Court makes the following findings of fact. To the extent that any findings of fact might constitute conclusions of law, they are adopted as such.

PBS&J Constructors, Inc. — registered owner of the fictitious name Peter R. Brown Construction, Inc.[1] — entered into a construction contract (Prime Contract) with the United States of America, contracting through the Army Corps of Engineers, on August 16, 2010. (JX-13). The Prime Contract was for the project known as the Joint Intelligence Technical

---

[1]   As stated in the amended complaint, PBS&J and PRBC "are treated as interchangeable in communications to [Ragghianti] and others." (See Doc. # 59 at 4). Accordingly, this Court will refer to these entities collectively as "PRBC."

Training Facility at Goodfellow Air Force Base in San Angelo, Texas (Project). (Id.). Sureties Liberty Mutual Insurance Company and Safeco Insurance Company of America issued a Payment and Performance Bond (no. 6724282) on August 23, 2010, in accordance with the Miller Act, 40 U.S.C. § 3131, naming PRBC as principal. (JX-16).

On January 24, 2011, PRBC entered into a Subcontract with Ragghianti to provide the building foundation, slab on grade, miscellaneous concrete and site concrete to the Project for the original lump sum of $506,902. (JX-1). The Subcontract - drafted by PRBC - expressly incorporates all the terms of the Prime Contract. (Id.).

The Subcontract incorporated a schedule for its work that called for Ragghianti to mobilize with labor and supervision beginning on March 5, 2011. (Ragghianti Dep. Doc. # 96-10 at 19-21). However, Ragghianti did not provide a bond – issued by American Safety Casualty Insurance Company - until March 23, 2011 (JX-4), and the Subcontract provided that Ragghianti could not begin work on the Project until a bond was provided (JX-1).

As PRBC was behind schedule on the Project, Ragghianti's commencement of performance of the Subcontract was delayed. (Doc. # 148 at 42-3; Ragghianti Dep. Doc. # 96-10 at 19-21).

It was not until the first week in July of 2011, that PRBC was prepared for Ragghianti to begin performance. (Ragghianti Dep. Doc. # 96-10 at 20-21; PX-30; PX-33; PX-60).

However, during July and August of 2011, as a result of unforeseen soil conditions, drilling on the Project was delayed. (PX-60; PX-61). In August of 2011, the pier drilling operations got back on schedule, but Ragghianti was unable to provide a sufficient number of local workers. (DX-18; DX-19; DX-20). Ragghianti was informed that failure to provide sufficient workers was causing a delay to the Project. (DX-20). Therefore, Ragghianti entered into a contract with subcontractor Jack Daniels Construction, Inc. to provide the labor to excavate, backfill, form, and pour the grade beams and to pour the slab on grade. (James Barlow Dep. Doc. # 98-5 at 24; Ragghianti Dep. Doc. # 96-10 at 22; Baron Steve White Dep. Doc. # 99-1 at 66).

Jack Daniels worked on the Project from August 21, 2011, through September 21, 2011. (PX-68). However, after an inspection by the Corps discovered that several of the piers were slightly out of tolerance, the grade beam work on the Project was halted. (Id.). Jack Daniels was told to demobilize, and at that time, Jack Daniels advised PRBC and Ragghianti that its crew was being moved to a different

project and all of its equipment would be off the Project by September 23, 2011. (DX-21; DX-22).

During the pier shutdown, PRBC changed the sequence such that the assembly of the steel would now come before the concrete slab on grade activity. (Doc. # 162 at 6). Furthermore, PRBC developed a grade beam sequence change that would cause grade beams to be poured in quadrants instead of south to north as previously scheduled. (Doc. # 149 at 140). This change was made to accommodate PRBC's mechanical contractor who requested access. (Doc. # 151 at 23-25). In addition, the schedule was changed to double the duration of the grade beam work. (PX-50). As a result, PRBC provided Ragghianti twenty days to complete the grade beams. (Doc. # 151 at 30-31).

The pier tolerance issue was resolved by October 18, 2011, and PRBC directed Ragghianti to remobilize its forces to begin work on October 21, 2011. (DX-24; PX-72). However, because Jack Daniels' forces and equipment were on another project, Ragghianti was unable to return to the Project until October 23, 2011. (PX-70; DX-51; Doc. # 151 at 27). In an attempt to recover the schedule, PRBC offered to pay Ragghianti acceleration monies if it worked overtime and increased its forces on the Project. (Doc. # 151 at 25).

After the work recommenced, PRBC was issued an "interim unsatisfactory" from the Corps in draft form, and the record reflects that PRBC's superintendent found that the Corps' comments were accurate. (PX-76; Doc. # 151 at 185-86). Accordingly, PRBC was labeled unsatisfactory in every single aspect of its work in compiled ratings of federal government staff, including management of resources, coordination and control of subcontractors, and effectiveness of job site supervision. (JX-15).

In November of 2011, PRBC made a request to have Ragghianti increase its forces, but Jack Daniels informed Ragghianti that it had its workers on other projects and it would be unable to provide the number of workers required. (DX-21). Ragghianti did not seek to find additional workers, and as a consequence, PRBC hired Dalcan – a second subcontractor - to work on the grade beams in order to accelerate the Project schedule. (PX-113; Doc. # 147 at 105, 108).

Dalcan worked on the Project from November 17, 2011, to December 14, 2011. (PX-85). According to PRBC's superintendent, Dalcan made the situation worse, impeding Ragghianti's progress. (Dave Barkolz Dep. Doc. # 118-4 at 146). Upon review of the negative impact Jack Daniels claimed

Dalcan was having on its productivity, PRBC removed Dalcan from the Project. (Doc. # 147 at 105, 108). By December 14, 2011, Jack Daniels agreed to provide additional workers, and PRBC terminated Dalcan's contract. (PX-85; PX-86).

Ragghianti, through Jack Daniels, completed the grade beams on or about January 5, 2012, and continued backfilling the interior and exterior of a building on the Project. (PX-31). In mid-January of 2012, however, Jack Daniels presented PRBC with a series of claims totaling roughly $85,000, which represented its alleged losses. (PX-15). By January 24, 2012, Jack Daniels threatened to leave the Project if its claims were not paid. (PX-110). When its claims were not paid, Jack Daniels terminated its contract on January 27, 2012. (PX-114). After Jack Daniels left the Project, no further backfilling work was performed by Ragghianti. (Doc. # 163 at ¶ 43).

On February 14, 2012, Ragghianti was scheduled to place the first section of a building's 50,000 square foot concrete slab on grade. (Baron Steve White Dep. Doc. # 99-1 at 26; PX-32). Due to various changed considerations and other issues that arose on the day of the pour, Ragghianti's sub-subcontractor – at the time Ochoa - experienced difficulty in pouring the slab. (Ragghianti Dep. Doc. # 96-10 at 101-07;

Joseph Williams Dep. Doc. # 99-5 at 23; PX-225). Specifically, on the morning of February 14, 2012, Ragghianti's superintendent changed the location of the pump truck, but because Ragghianti had performed no exterior backfill after Jack Daniels demobilized, the site for the pump truck had to be leveled by hand and the placement on the slab on grade was delayed. (Doc. # 150 at 16; PX-22; PX-32; PX-123). Further, only 6 concrete finishers from Ochoa showed up on February 14, 2012, when 13 were expected to be present. (Doc. # 150 at 32-33).

Also on the day of the pour, Ragghianti failed to execute the sequence of the concrete trucks in accordance with the workforce it had and to ensure that it was within the contract specifications. (Doc. # 162 at 11; Doc. # 150 at 33-34). The maximum time the concrete was permitted to turn prior to pour was 90 minutes, as a longer delay permits the concrete to set up and become unworkable. (Doc. # 162 at 11; PX-303; David Smith Dep. Doc. # 118-3 at 18). Ragghianti's inadequate workforce on the day of the pour was unable to keep up with the pour. (PX-225). An analysis of the concrete truck tickets showed that 8 out of the 14 trucks had concrete that exceeded the 90 minute time limit, and as a consequence, the concrete

was too dry, too hot, and too hard to finish. (DX-64; Doc. # 150 at 34-35).

In all, 6,000 square feet of slab was poured on February 14, 2012, which was 13% of the slab concrete and 1-2% of the total concrete called for under the Subcontract. (Samuel Parker Dep. Doc. # 118-1 at 52; Ronald Harris Dep. Doc. # 118-6 at 18; Charles Diegel Dep. Doc. # 118-5 at 34-35). However, it is undisputed that the finish on the 6,000 square feet of slab was of "unacceptable quality." (Ragghianti Dep. Doc. # 96-10 at 100-101; Ronald Harris Dep. Doc. # 118-6 at 20; Charles Diegel Dep. Doc. # 118-5 at 35).

Dissatisfied with the pour, on February 16, 2012, PRBC issued a Failure to Perform Letter – also known as RF001 – to Ragghianti that stated:

> In accordance with Article 10 (Subcontractor's Failure to Perform) of the Subcontract . . . this letter serves as formal notice by [PRBC] that [Ragghianti] has failed to complete its scope of work in accordance with the contract documents.
>
> * * *
>
> In accordance with the provisions of the [S]ubcontract, unless this condition is remedied within 48 [hours] of this date [PRBC] shall take steps as necessary to overcome the condition in which case the Subcontractor shall be liable to [PRBC] for all losses including general conditions for supervision and loss of time.

* * *

>    Furthermore, Ragghianti is required to provide a
>    detailed plan of action prior to future concrete
>    placement . . . This plan must be submitted no later
>    than 1:00 P.M. on February 17, 2011 (sic).

(JX-34). Ragghianti responded to the Failure to Perform
Letter by providing its action plan, which stated in relevant
part that the demolition of the defective concrete slab "will
be able to commence no later than Monday, February 20, 2012,"
and be completed "arguably" by February 27, 2012. (PX-126;
Ragghianti Dep. Doc. # 96-10 at 124, 127).

Ragghianti's workers were on the Project February 17-
18, 20-21, 2012, but according to Ragghianti's daily reports,
no action was taken to remove the slab on any of those days.
(PX-31). When no action was taken to remove the slab by
February 22, 2012, PRBC lost all faith that Ragghianti was
going to promptly remove the slab and made the decision to
exercise its rights under the Subcontract and terminate
Ragghianti for default. (Doc. # 150 at 97-98; Doc. # 151 at
81-82).

On February 22, 2012, PRBC issued a Notice of Termination
Letter – also referred to as RF002 – which stated:

10

> Ragghianti has failed to cure or otherwise have
> (sic) been unable to eliminate the default as
> outlined in [PRBC's] February 12, 2012[,] letter.
>
> * * *
>
> [On] February 17, 2012, regarding Ragghianti's
> action plan to address [the deficiencies outlined
> in PRBC's February 12, 2012, letter, Ragghianti]
> specifically stated that: "The demolition of the
> existing [Slab on Grade] will be able to commence
> no later than Monday, February 20, 2012[,] and can
> arguably be completed in about a week's time." To
> date, Ragghianti has not started this corrective
> work . . . [PRBC] hereby terminates Ragghianti for
> default pursuant to Section 10 of the
> [Subcontract].

(JX-35). PRBC noted that the deficiencies giving rise to the termination included, but were not limited to, failure to provide sufficient manpower, failure to provide adequate supervision, and work not in compliance with Subcontract requirements. (Id.). PRBC delivered RF002 to Ragghianti on February 23, 2012, via e-mail. (PX-32; Doc. # 150 at 19).

Although RF002 indicated that Ragghianti had not begun removing the slab, Ragghianti did have one worker and one piece of equipment that it borrowed from PRBC on the Project on February 22-23, 2012, and there was some work performed in an attempt to break up the slab. (Doc. # 147 at 99-100). However, PRBC did not consider this to be a sufficient effort,

on behalf of Ragghianti, to begin removal of the slab as it would take at least 10 days at that rate to remove the slab, which would be outside Ragghianti's own deadline of February 27, 2012. (Doc. # 162 at 13; Doc. # 147 at 98).

Thereafter, PRBC hired subcontractors Sack & Gorman to remove the slab and haul away the debris and to complete the interior and exterior backfilling and grading work that had been abandoned by Jack Daniels at the end of January of 2012. (Doc. # 162 at 13; DX-130). PRBC also hired another contractor – Cantera – to complete the remaining work under Ragghianti's Subcontract. (Id.).

The crux of this action involves a dispute amongst the parties as to whether Ragghianti timely started the corrective work. Therefore, there is a dispute as to whether Ragghianti was properly terminated for default or terminated for convenience. Pursuant to the Subcontract, a termination for default requires certain notices and conditions precedent that a termination for convenience does not.

Ragghianti initiated this action against PRBC, Liberty Mutual and Safeco Insurance on April 27, 2012 (Doc. # 1), and filed an amended complaint on April 26, 2013 (Doc. # 59). In the amended complaint, Ragghianti alleges that although it "has repeatedly demanded payment from [PRBC] for labor,

12

material, and services provided pursuant to the [entities'] Subcontract," PRBC "has failed and refused to make payment in breach of the Subcontract." (Id. at ¶¶ 18-19). Ragghianti filed suit for nonpayment of its contract balance, damages due to its termination – claiming it was wrongful – and for costs of delay and acceleration of its work. (See Doc. # 59). Ragghianti also brings an alternative claim for its damages based on the cardinal change doctrine. (Id. at 8). Ragghianti further alleges a Miller Act breach of contract suit against PRBC and against Liberty Mutual and Safeco Insurance as co-sureties on the Miller Act bonds. (Id. at 7).

On May 10, 2013, PRBC filed counterclaims against Ragghianti and American Safety: (1) Contractual Indemnification (against both Ragghianti and American Safety) and (2) Breach of Contract (against Ragghianti). (See Doc. # 64). Subsequently, the parties filed cross motions for summary judgment (Doc. ## 95, 96), and the Court denied both motions on January 10, 2014 (Doc. # 114).

On February 19, 2014, PRBC filed a notice of settlement and joint stipulation of dismissal with prejudice of its claims against American Safety (Doc. # 127), and on February 20, 2014, this Court dismissed the claims with prejudice (Doc.

# 128). This Court held a bench trial in this case commencing on February 24, 2014, and concluding on March 4, 2014.

## II.  **Conclusions of Law**

The Court makes the following conclusions of law. To the extent that any conclusions of law might constitute findings of fact, they are adopted as such.

### A. **PRBC's Motion to Conform the Pleadings to the Evidence**

"[D]espite PRBC's failure to comply with the technical requirements of Federal Rule of [Civil] Procedure 8(c), which governs the pleading of affirmative defenses, PRBC requests that the Court apply the liberal standards of Rule 15(b) and permit an amendment of the [c]ounterclaim to include the affirmative defense of release." (Doc. # 154 at 2-3).

To support this argument, PRBC submits that Ragghianti was on notice that PRBC intended to assert the affirmative defense of release seven months prior to trial, despite PRBC's failure to plead release as an affirmative defense in its answer. (Id. at 2). Specifically, PRBC argues that it raised the defense of release during James Barlow's deposition on July 19, 2013, in its motion for partial summary judgment filed on September 23, 2013, and in the amended joint pretrial statement filed on January 3, 2014. (Id.). Furthermore, PRBC

contends that, although arguing in the context of waiver, Ragghianti responded to PRBC's defense of release on the merits in its response in opposition to PRBC's motion for partial summary judgment. (Id.).

According to PRBC, a party has notice of an affirmative defense, and so no prejudice results to that party where, for example, the affirmative defense has been raised during a deposition or in a motion for summary judgment. (Id. at 3)(citing Hassan v. United States Postal Serv., 842 F.2d 260, 263 (11th Cir. 1988)(holding government's failure to assert an affirmative defense in its pleadings did not preclude admission of evidence on the issue where government had questioned plaintiff about issues relating to the affirmative defense during a deposition and in an interrogatory); Hartwell v. City of Montgomery, Ala., 487 F. Supp. 2d 1313, 1329 (M.D. Ala. 2007)(finding that plaintiff was provided with notice of affirmative defense because it was included in a motion for summary judgment, which gave plaintiff an opportunity to rebut the defense in his opposition brief)). As evidenced above, PRBC contends that it has raised the issue of release throughout the course of this litigation, and as a result, argues that it is appropriate for the Court "to utilize Rule 15(b) to ensure that the claims in this matter

15

are decided on their merits rather than procedural niceties by amending the pleadings to conform to the evidence." (Doc. # 154 at 5).

Conversely, Ragghianti submits that PRBC never asked Ragghianti's two deposed witnesses a single question related to the issue of release, nor did it inquire into the matter in paper discovery. (Doc. # 157 at 1-2, 6). Additionally, Ragghianti points out that its response in opposition to PRBC's motion for partial summary judgment first states that PRBC may not argue the matter of release as PRBC never pled the defense and therefore waived it. (See Doc. # 98 at 2-3, 17-18; Doc. # 157 at 2). Then, "in an abundance of caution," Ragghianti "briefly challenged the claim's merit and objected to it." (Id.).

Ragghianti also argues that PRBC offers no authority that supports its proposition that this Court should grant leave to amend where the matter at issue was not tried by consent, but instead was subject to continuous objection. (Doc. # 157 at 5). Thus, Ragghianti submits that it has adequately demonstrated that it was prejudiced in its ability to show PRBC's defense of release was unsustainable on the facts and law.

"Release is an affirmative defense, and a party must
plead it or it is waived." Rakip v. Paradise Awnings Corp.,
514 F. App'x 917, 920 (11th Cir. 2013); Latimer v. Roaring
Toyz, Inc., 601 F.3d 1224, 1239 (11th Cir. 2010) (finding
that "Failure to plead an affirmative defense generally
results in a waiver of that defense.").

Fed. R. Civ. P. 15 states, in relevant part:

(b) Amendments During and After Trial.

> (1)  Based on an Objection at Trial. If, at
>      trial, a party objects that evidence is
>      not within the issues raised in the
>      pleadings, the court may permit the
>      pleadings to be amended. The court should
>      freely permit an amendment when doing so
>      will aid in presenting the merits and the
>      objecting party fails to satisfy the court
>      that the evidence would prejudice that
>      party's action or defense on the merits.
>      The court may grant a continuance to
>      enable the objecting party to meet the
>      evidence.

Fed. R. Civ. P. 15(b)(1).

As the Eleventh Circuit stated in Hassan:

> Admittedly, the general rule is that, when a party
> fails to raise an affirmative defense in the
> pleadings, that party waives its right to raise the
> issue at trial. However, the liberal pleading rules
> established by the Federal Rules of Civil Procedure
> apply to the pleading of affirmative defenses. We
> must avoid hypertechnicality in pleading

> requirements and focus, instead, on enforcing the
> actual purpose of the rule.
>
> The purpose of Rule 8(c) is simply to guarantee
> that the opposing party has notice of any
> additional issue that may be raised at trial so
> that he or she is prepared to properly litigate it.
> When a plaintiff has notice that an affirmative
> defense will be raised at trial, the defendant's
> failure to comply with Rule 8(c) does not cause the
> plaintiff any prejudice. And, when the failure to
> raise an affirmative defense does not prejudice the
> plaintiff, it is not error for the trial court to
> hear evidence on the issue.

842 F.2d at 263 (internal citations omitted).

It is undisputed that PRBC did not plead the affirmative defense of release in its responsive pleadings and did not seek to amend its pleadings throughout the duration of this litigation prior to the present Motion to Conform the Pleadings. Instead, PRBC argues that because it raised the defense of release during James Barlow's deposition, in its motion for partial summary judgment, and in the amended joint pretrial statement, filed on January 3, 2014 – roughly two months before commencement of the trial - that this Court should conform the pleadings to the evidence. The Court declines PRBC's request.

In its January 10, 2014, Order, the Court determined that it was too late in the proceedings for PRBC to assert

the affirmative defense of release. (See Doc. # 114). Further, in its response in opposition to PRBC's summary judgment, Ragghianti made it clear that it was only acknowledging the matter of release in an abundance of caution, and even prefaced its response by challenging whether PRBC had waived the defense of release.

Moreover, the Court notes that the defense of release was not tried by express or implied consent by Ragghianti. In fact, the defense was subject to continuing objection by Ragghianti during the course of the trial. The Court found during trial, as it does today, that Ragghianti has demonstrated sufficient prejudice in its ability to adequately defend against PRBC's affirmative defense of release, due to PRBC's failure to raise the affirmative defense in a timely manner. (Doc. # 147 at 205, 234); see Stewart v. Hooters of Am., Inc., No. 8:04-cv-40-T-17MAP, 2007 WL 3528685, at *6 (M.D. Fla. 2007) aff'd, 432 F. App'x 903 (11th Cir. 2011)(denying defendant's motion to amend the pleadings to conform to the evidence as plaintiff would suffer "incurable prejudice . . . in the form of inability to depose and call witnesses on the matter, and inability to conduct discovery on the matter ."); see also Eugene v. 3Don & Partner Estate Grp., LLC, No. 07-80439-CIV, 2009 WL 1810735, at *4

(S.D. Fla. June 24, 2009)(citing <u>Browning Debenture Holder's</u>
<u>Comm.</u>, 560 F.2d 1078, 1086 (2d Cir. 1977) (affirming district
court's denial of post-trial motion to amend complaint which
sought to add new paragraphs, some of which raised new claims,
because the *claims had never been tried by the express or*
*implied consent of the parties, such that allowing the*
*amendment would have substantially prejudiced the*
*defendant*)(emphasis added)). Accordingly, PRBC's Motion to
Conform the Pleadings is denied.

### B. <u>Applicable Law Surrounding Contract Documents</u>

The Subcontract – by way of Article 22.3 - provides for
the application of law as follows:

> Unless otherwise provided in the Contract
> Documents, the terms and conditions of this
> Subcontract shall be interpreted in accordance with
> the laws of the jurisdiction where the Project is
> located, exclusive of conflict of law provisions.

(JX-1). The Project was located in San Angelo, Texas. (Doc.
# 59 at ¶ 9).

Article 22.3 includes the caveat "Unless otherwise
provided in the Contract Documents." The Contract Documents
encompass Exhibit K, which expressly incorporates the Federal
Acquisition Regulations (FAR). (JX-1; JX-12). According to
the Subcontract, in the event of a conflict between the FAR

provisions and the Subcontract, or any exhibits thereto, the FAR provisions shall control. (<u>Id.</u>). As a result, this action is governed by the Contract Documents, Texas state law, and the FAR.

### C. <u>Ragghianti's Breach of Contract Claim Against PRBC</u>

#### 1. <u>Whether PRBC's Termination of Ragghianti Was For Default or Convenience</u>

Ragghianti contends that the termination for default and convenience provisions in the Subcontract are ambiguous. (Doc. # 161 at 73). Therefore, Ragghianti submits that the FAR requirements for termination control. (<u>Id.</u>).

Specifically, Ragghianti provides that Exhibit K of the Subcontract incorporates FAR provisions into the Subcontract, even those not explicitly referenced therein, by providing a website address to the FAR provisions, and stating that in the event of a conflict between the FAR and the Subcontract or any exhibits thereto, the FAR provisions control. (<u>Id.</u>). "Therefore, because the Subcontract's provisions for termination for default and convenience are unclear, the FAR's clear requirements necessarily control. . . ." (<u>Id.</u>).

Exhibit K, section II, paragraph 3 states:

> The following FAR provisions are hereby
> incorporated by reference into this Subcontract,
> with the same force and effect as if set forth in
> full text herein. The full text can also be accessed

21

> electronically at http://farsite.hill.af.mil and
> http://www.acqnet.gov/far. Under no circumstances
> shall Subcontractor raise as a claim or defense its
> failure to be aware of the application of, or
> understand its obligations to comply with, the
> requirements of the FAR.

(JX-12).

In essence, Ragghianti is attempting to incorporate all of the FAR provisions listed on the website into the Subcontract; namely 48 C.F.R. § 49.402-3(d):

> (d) Subdivisions (a)(1)(ii) and (a)(1)(iii) of the
> Default clause cover situations when the contractor
> fails to perform some of the other provisions of
> the contract (such as not furnishing a required
> performance bond) or so fails to make progress as
> to endanger performance of the contract. If the
> termination is predicated upon this type of
> failure, **the contracting officer shall give the
> contractor written notice specifying the failure
> and providing a period of 10 days** (or longer period
> as necessary) **in which to cure the failure**. When
> appropriate, this notice may be made a part of the
> notice described in subparagraph (e)(1) of this
> section. Upon expiration of the 10 days (or longer
> period), the contracting officer may issue a notice
> of termination for default unless it is determined
> that the failure to perform has been cured. A format
> for a cure notice is in 49.607.

48 C.F.R. § 49.402-3(d) (emphasis added). Ragghianti's position is that it never received a 10-day notice, as required under the FAR. (Doc. # 161 at 74).

22

However, according to PRBC, when Exhibit K is read pursuant to its plain terms, the only FAR provisions incorporated into the Subcontract are those expressly provided in paragraph 5, which does not include the FAR provision referenced by Ragghianti. (Doc. # 162 at 13-14). The Court agrees.

Exhibit K, section II, paragraph 3, does not provide that all FAR provisions are incorporated by reference. Instead, it provides that the FAR provisions listed within Exhibit K are to be given the same effect textually as if the full text – located on the supplied websites – was provided. Therefore, the only incorporated FAR provisions are those explicitly provided for in the Subcontract and corresponding documents, and none of the FAR provisions concern termination. Therefore, no conflict exists, and as a result, the Subcontract terms, specifically Article 10.1, control.

### 2. **Whether PRBC Complied with Article 10.1**

Article 10.1 of the Subcontract states in relevant part:

If, in the reasonable opinion of The Construction Manager, Subcontractor shall at any time (1) refuse or fail to provide sufficient properly skilled workers, adequate supervision or material of the proper quality; (2) fail in any material respect to prosecute Subcontractor's Work according to the Project's current schedule; (3) cause, by any action or omission, the stoppage or delay of or

interference with the work of The Construction
Manager or of any other contractor or
subcontractor; (4) fail to comply with any
provision of this Subcontract or the Contract
Documents; (5) make a general assignment for the
benefit of its creditors; (6) have a receiver
appointed; (7) become insolvent; (8) fail to make
proper payments to its Lower-Tier Subcontractors;
or (9) fail to prosecute Subcontractor's Work
according to the Schedule of Values or Subcontract
Price then, after serving two (2) days' written
notice, unless the condition specified in such
notice shall have been eliminated within such two
(2) days or if not possible to have been eliminated,
the Subcontractor demonstrates in good faith that
it is attempting to expeditiously resolve the
condition, The Construction Manager, at its option,
without voiding the other provisions of this
Subcontract and without prejudice to other remedies
it may have under this Subcontract or law, and
without notice to the sureties, may . . . (ii)
terminate for default Subcontractor's performance
of all or a part of the Subcontractor's Work . . .
.

(JX-1 at 10-11).

After the February 14, 2012, pour, PRBC sent RF001

referencing Article 10 of the Subcontract and demanded the

slab be removed "immediately." (JX-34). The evidence at trial

demonstrates that Ragghianti understood that RF001 was the

"48 hour notice" to remedy the defective condition, as

required by Article 10.1 – "Your letter gives [Ragghianti] a

48 hour notice to remedy these issues." (PX-121). In response,

Ragghianti presented an action plan on February 17, 2012,

which provided for the demolition of the slab to commence on

February 20, 2012, and be completed "arguably" by February 27, 2012. (PX-126; Ragghianti Dep. Doc. # 96-10 at 124, 127). However, although Ragghianti had workers at the Project on February 17-18, 20-21, 2012 (PX-31), no satisfactory action was taken to remove the slab. Therefore, on February 22, 2012, PRBC sent Ragghianti RF002 outlining several deficiencies giving rise to the termination. (JX-35).

Baron Steve White testified that the decision to terminate Ragghianti was not based solely upon the defective slab pour that occurred on February 14, 2014. (Doc. # 151 at 83). In fact, PRBC notified Ragghianti that there were several additional "deficiencies related to the placement and finish of building concrete: (1) failure to provide sufficient manpower; (2) failure to provide adequate supervision; and (3) work not in compliance with contract documents." (See JX-35). Baron Steve White also testified that he did not approve Ragghianti's action plan submitted on February 17, 2012, and thus, Ragghianti did not adequately respond to RF001 even before failing to commence demolition prior to February 20, 2012, in accordance with that plan. (Doc. # 151 at 135). Therefore, the evidence demonstrates that PRBC formed the reasonable opinion that Ragghianti failed to comply with the

Subcontract requirements. Accordingly, PRBC could invoke Article 10.1's procedures for termination.

As the evidence reveals that PRBC complied with the two-day notice requirement, the question becomes whether Ragghianti demonstrated in good faith that it was attempting to expeditiously resolve the condition – the defective concrete pour. PRBC argues that Ragghianti did not demonstrate in good faith that it was attempting to expeditiously resolve the condition as it made no effort on February 17-18, 20-21, 2012, to remove the slab. In fact, Ragghianti disputed, and continued to do so at trial, that the slab needed to be removed. (Doc. # 148 at 68-70).

The evidence reflects that Ragghianti set its own timetable to remove the slab stating that it would begin the work on Monday, February 20, 2012, and have the slab removed by February 27, 2012. (PX-126; Ragghianti Dep. Doc. # 96-10 at 124, 127). However, when no action was taken by February 22, 2012, and only one worker and one piece of equipment was on the Project allegedly removing the slab, PRBC decided to invoke its contractual rights and terminate Ragghianti. (Doc. # 151 at 81-82). From the evidence presented, the Court determines that Ragghianti was not attempting to expeditiously resolve the deficiencies in good faith, and

instead, was continuously disputing the deficiencies set forth in the termination notice.

### 3. Whether Ragghianti Was Provided An Opportunity to Cure the Defective Condition

As pointed out by Ragghianti, under Texas law, "notification to terminate the [a]greement is effective only if its initial notification of the alleged breach provided [d]efendant[s] with an opportunity to cure." Hydril Co., L.P. v. Grant Prideco, L.P., No. CIV A H-05-0337, 2007 WL 1791663, at *4 (S.D. Tex. June 19, 2007)(Texas requires opportunity to cure)(quoting Am. Seating Co. v. Transp. Seating, Inc., 220 F. Supp. 2d 845, 848 (W.D. Mich. 2002)).

Ragghianti's position is that it was never provided the requisite notice required by the FAR or the Subcontract prior to its termination, and as a result, it was afforded no opportunity to cure. (Doc. # 161 at 75). Accordingly, Ragghianti contends that PRBC waived its opportunity to terminate Ragghianti as it was presumed to have accepted Ragghianti's action plan. (Id.)(citing Lyons v. Pollard, 87 U.S. 403, 406 (1874)("Where by the terms of a contract a party is bound to give thirty days' notice of an intention to terminate it, and having given the notice afterwards waives it, he may in fact renew the notice [and] at the expiration

27

of the required time the second document will operate as a notice.")).

PRBC, however, contends that Article 10.1 of the Subcontract is devoid of any requirement that PRBC notify Ragghianti that if it fails to cure the deficiency it can be terminated for default. This Court adopts PRBC's position.

PRBC sent Ragghianti RF001 (JX-34), which referenced Article 10 of the Subcontract and directed Ragghianti "to proceed immediately with removing the slab in its entirety. . . ." (Doc. # 162 at 16-17). As RF001 referenced Article 10, Ragghianti was on notice that it was subject to being terminated for default if it failed to comply with the cure notice directive. (JX-34). To that end, the evidence demonstrates that Ragghianti understood that RF001 was the "48 hour notice" to remedy the issues, as required by Article 10.1. (PX-121).

For the reasons set forth above, the Court finds that PRBC's termination of Ragghianti was a termination for default. PRBC was dissatisfied with the February 14, 2012, pour, and provided Ragghianti with the requisite notice to cure the defective condition. Ragghianti did not comply with PRBC's directive, and as a result, PRBC properly terminated the Subcontract pursuant to Article 10.1.

As the Court finds that the termination was one for default, the Court declines to determine whether the termination was wrongful or improper, as requested by Ragghianti.

### 4. <u>Damages</u>

At trial, Ragghianti testified that it suffered lost profits on the work it was precluded from performing due to PRBC's termination in the amount of $97,206 (Doc. # 148 at 184; PX-6); unabsorbed home office overhead totaling $85,417; and $51,806 in increased costs attributable to delay and interference of PRBC ($43,172.10 plus standard markup of $8,634.42 (20%)) (PX-6; Doc. # 148 at 184-85). Ragghianti also testified that the claims of Jack Daniels were $143,761 ($24,979 in lost profit, $12,090 in unabsorbed home office overhead and $106,691 in outstanding claims or change order requests), to which was added to Ragghianti's standard markup for a total of $172,514 (PX-6; V2 at 185). Ragghianti's expert – Jens Baker – testified that the damages suffered by Ragghianti and Jack Daniels total $520,735.23. (Doc. # 149 at 165).

To the extent Ragghianti seeks to obtain damages on behalf of Jack Daniels, this Court notes that Jack Daniels has an action currently before the Honorable Susan C. Bucklew:

Case No. 8:12-cv-2921-T-24TBM. Although Ragghianti seeks to include Jack Daniels' "pass through" claims in its damages claim, which albeit may be standard practice, this Court determines that Jack Daniels can adjudicate its own claims, and seek its individual damages, by separate action.

### a) Lost Profits

Ragghianti's claim for lost profits rests on two alternative grounds. (Doc. # 161 at 80). First, Ragghianti argues that PRBC's termination was wrongful, in bad faith and undertaken in PRBC's own self-interest to the detriment of Ragghianti. (Id.)(citing Cent. Marine Inc. v. United States, 153 F.3d 225, 230 (5th Cir. 1998)("A contractor's right to recover for anticipated profits arises only if the termination of the contract is wrongful and constitutes a breach.")). This Court has previously declined to address whether PRBC's termination was wrongful or improper.

Alternatively, Ragghianti submits that under the express terms of the Subcontract, Ragghianti has the same rights against PRBC as PRBC has against the Owner.[2] (Doc. # 161 at 80). Therefore, Ragghianti argues that its lost profit claim

---

[2]   According to the Subcontract, the "Owner" is defined as the USACE Little Rock District. (JX-1 at 2).

on unperformed work is consistent with PRBC's claim to the
Corps. (Id.).

Recovery for lost profits does not require that the loss
be susceptible to exact calculation. White v. SW Bell Tel.
Co., 651 S.W. 2d 260, 262 (Tex. 1983). In has been noted that
"in virtually all damages calculations, there is some degree
of subjectivity involved, especially when forecasting future
profits and losses." SJW Prop. Com., Inc. v. SW Pinnacle
Props., Inc., 328 S.W. 3d 121, 162 (Tex. App. 2010). Estimates
of lost profits must be based on objective facts, figures, or
data from which the amount of lost profits can be ascertained.
Holt Atherton Indus., Inc. v. Heine, 835 S.W. 2d 80, 84 (Tex.
1992). Although supporting documentation may affect the
weight of the evidence, it is not necessary to produce the
documents supporting the opinions or estimates. Id.

Lost profits are recoverable "if the evidence shows that
the loss of profits was a material and probable consequence
of the breach complained of and the amount due is shown with
sufficient certainty." Cmty. Dev. Serv., Inc. v. Replacement
Parts Mfg., Inc., 679 S.W. 2d 721, 725 (Tex. App. 1984).
Generally, lost profits are properly calculated by deducting
from the actual contract price the costs of the injured
party's performance supported by data. Id. "However, a

31

witness may also prove lost profits by testifying as to what his profit would have been, based on his knowledge of the cost of performance of each element of the contract and subtracting the total of such costs from the contract price." B & W Supply, Inc. v. Beckman, 305 S.W. 3d 10, 17 (Tex. App. 2009).

According to PRBC, Article 33 - Mutual Waiver of Consequential Damages - bars Ragghianti's claimed damages for unearned profits:

> Except as provided in Exhibit G, Section 2, Liquidated Damages, The Construction Manager and Subcontractor waive all claims against each other for indirect or consequential damages arising out of or relating to this Subcontract or the Contract Documents, *including without limitation, loss of anticipated profit, business interruption, loss of use or loss of opportunity*.

(JX-1 at 17-18)(emphasis added).

Exhibit G, Section 2, Liquidated Damages states in relevant part:

> If [PRBC] is required to pay liquidated damages as set forth in the Prime Contract on account of Subcontractor's failure to perform Subcontractor's Work in strict accordance with the Schedule, such liquidated damages shall be deemed to be actual damages owed by Subcontractor to [PRBC] under Section 8 of the Subcontract, and shall not be a limit on damages owed by Subcontractor to [PRBC].

(JX-8).

Ragghianti contends that Exhibit G, Section 9 –
Limitation of Remedies; No Damages for Delay - modifies
Article 33 to permit lost anticipated profit:

> *The rights and obligations of Subcontractor shall
> be the same as the rights and obligations of the
> Construction Manager under the General Terms and
> Conditions of the Prime Contract.*
>
> Any claims by Subcontractor for *delay or additional
> costs* must be submitted to [PRBC] three (3)
> business days prior to the time, and in the manner,
> in which [PRBC] must submit such claims to the
> Owner, and failure to comply with such conditions
> for giving notice and submitting claims shall
> result in the waiver of such claims.
>
> In addition to the foregoing, in other cases in the
> Prime Contract where specific notice is required,
> Subcontractor shall be required to provide notice
> to [PRBC] three (3) business days earlier, so that
> [PRBC] may analyze such notice and forward it to
> the Owner within the time period required by the
> Prime Contract.

(JX-8)(emphasis added).

However, PRBC claims that Exhibit G, Section 9 only
applies to pass-through claims to the Owner – the Government
– in the event that the Government has done something to delay
or hinder performance or otherwise cause damages to PRBC and
its subcontractors. (Doc. # 162 at 34). Thus, PRBC argues
that it has no applicability to the unearned lost profits

33

claimed by Ragghianti. (Id.). Upon review of Exhibit G, Section 9, it is not apparent to this Court that it only applies to pass-through claims. In fact, the provision is devoid of any such language. Therefore, the Court does not join PRBC's interpretation on this provision.

Nonetheless, PRBC argues that even if Exhibit G can be read to give Ragghianti the same rights as PRBC has against the Owner, consequential damages – such as unearned lost profits and unabsorbed home office overhead – are still unrecoverable. (Id.). Under the Prime Contract, if the Government terminated PRBC for convenience,[3] 48 C.F.R. § 52.249-2 would govern the rights and obligations of PRBC. (JX-13). Under 48 C.F.R. § 52.249-2(f), PRBC would only be entitled to a reasonable profit for work done. (Id.).

Additionally, 48 C.F.R. § 52.249-2(g)(2)(iii) provides that the Contractor is entitled to "a sum, as profit on subdivision (g)(2)(i) of this clause, determined by the

---

[3]    The Court notes that reasonable profits are only allowed under the FAR for work already performed and only when there has been a termination for convenience. See 48 C.F.R. §§ 52.249-2(g)(2)(ii); 49.202(a). Although this Court has already found PRBC's termination of Ragghianti was one of default, it will discuss the applicability of the relevant FAR provisions to bolster its position on why Ragghianti is not entitled to consequential damages under a finding of either a termination for default or termination for convenience.

Contracting Officer under 49.202 of the FAR . . . to be fair and reasonable." (Id.). Section 49.202 of the FAR provides, in relevant part, that "the TCO shall allow profit on preparations made and work done by the contractor for the terminated portion of the contract but not on the settlement expenses. *Anticipatory profits and consequential damages shall not be allowed*." See 48 C.F.R. § 49.202(a)(emphasis added). Thus, according to PRBC, it is clear that a terminated Contractor is only allowed reasonable profit on the work already performed under the Prime Contract and the referenced FAR provisions.

Instead of reasonable profit on the work completed or preparations for that work, however, Ragghianti is seeking anticipatory profits on the work it did not perform as a result of its termination. Ragghianti's request for unearned profits is not the type of profit allowed under the Prime Contract. As Ragghianti is entitled to the same rights and obligations as PRBC under the Prime Contract, unearned profits are not available to Ragghianti, either.

### b) Delay Damages

At trial, Ragghianti made a claim for "total unabsorbed home office overhead" of $85,417 (JX-19), which it claims is the "cost of the extended duration of days of the Project,"

35

which resulted from the Project lasting "261 more days past the original contract completion date." (Doc. # 148 at 184).

PRBC takes issue with Ragghianti's claimed damages as it contends that this is a "total cost claim," which is "universally disfavored." (Doc. # 139 at 8)(quoting Integrated Logistics Support Sys. Int'l, Inc. v. United States, 47 Fed. Cl. 248, 260 (Fed. Cl. 2000) aff'd, 36 F. App'x 650 (Fed. Cir. 2002)). Specifically, PRBC argues that Ragghianti's expert – Jens Baker – calculated claims for Ragghianti by taking its total labor hours and total costs and deducting its estimate, in order to determine Ragghianti's damages, which PRBC posits is a total cost claim. (Id.)("Under the total cost method, damages are calculated by subtracting the amount the contractor has already been reimbursed from the aggregate amount the contractor spent from the project.").

According to PRBC, a "contractor's obligation of carrying [its] burden of submitting satisfactory proof of damages also includes the burden of submitting fully substantiating supporting evidence that its actual costs are reasonable." (Id.)(citing Cavalier Clothes, Inc. v. United States, 51 Fed. Cl. 399, 418 (Fed. Cl. 2001)("[A]vailability of [the total cost method] hinges on whether: '(1) the nature

36

of the particular losses make it impossible or highly
impractical to determine them with a reasonable degree of
accuracy; (2) the plaintiff's bid or estimate was realistic;
(3) its actual costs are reasonable; and (4) it was not
responsible for the added expenses.'")). To that end, PRBC
submits that:

> [N]o evidence was produced by which anyone could
> calculate the home office overhead of [Ragghianti].
> Jens Baker merely claimed that he received that
> number from [Ragghianti] and that it was calculated
> wholly by the company. No documents were produced
> in support of that claim. [Jens] Baker also does
> not make any determination as to whether the
> estimates of [Ragghianti] . . . were reasonable. *
> * * Jens Baker opined that he took no account of
> any delays occasioned by [Ragghianti] in reducing
> the damages in any way, shape or fashion. His
> testimony was simple: PRBC is responsible for 100%
> of the delays and 100% of the losses over estimates.

(Doc. # 139 at 9-10).

PRBC admits that Ragghianti is entitled to recover those
expenses occasioned by PRBC's breach. (Id. at 10). However,
Ragghianti may not include all costs arising from the
performance of the Subcontract as the basis for its recovery.
(Id.). Especially, as PRBC suggests, the quantum of delay is
not solely attributable to PRBC; instead, there remains
serious conflict in the evidence as to exactly what

Ragghianti's pre-bid estimate was and its reasonableness. (Id.).

Conversely, Ragghianti contends that Jens Baker did not use a total cost method in his damages calculation. (Doc. # 146 at 11). Particularly, Ragghianti submits that Jens Baker did not simply take an aggregate of costs and subtract from it the estimated costs of performing the regular work under the Subcontract, but rather identified each and every increased cost experienced by Ragghianti as a result of PRBC's delay and termination. (Id.; see Doc. # 146-1).

A total cost claim is a method whereby damages are measured by the difference between the actual cost of performing the contract and the costs estimated in the contractor's proposal. WRB Corp. v. United States, 183 Ct. Cl. 409, 426 (1968). At trial, the evidence demonstrated that after completion of the schedule review by Jens Baker, he identified the activities – while Ragghianti was on the Project - that resulted in delays to the forecasted completion date. (See Doc. # 146 at 12). Once these activities were identified, Jens Baker determined the party responsible for the delay. (Id.). By doing so, Jens Baker opined that PRBC was responsible for 261 days of delay suffered by Ragghianti. (Id.).

The damages determined by Jens Baker consist of
"equipment, materials, superintendent, and travel costs which
were incorporated as a direct result of the extended duration
of the [P]roject time and other requirements and changes made
by [PRBC]." (Id.). The damages "do not include any costs for
labor increases [or] labor inefficiencies. . . ." (Id.). The
Court notes that there is no assertion by PRBC that the amount
of Ragghianti's claims are unreasonable, nor was there any
evidence presented that Ragghianti was substantially
responsible for any of its own added expense. (Id.).
Therefore, the Court finds that Ragghianti's claim is not one
of a "total cost claim."

Regardless of this Court's determination as to whether
Ragghianti's claim is a "total cost claim," PRBC argues that
Ragghianti's delay damages are expressly barred by Article
8.4's "no damages for delay" clause, which states in pertinent
part:

> Subcontractor shall not be entitled to any claim
> for damages (including but not limited to claims
> for delay, accelerations, time impact, extended
> general conditions, extended field or home office
> overhead, loss of profits, loss of use, equipment
> rental) on account of hindrances or delays from any
> cause whatsoever. An extension of time shall be
> Subcontractor's sole and exclusive remedy for any
> occurrence giving rise to a delay and The
> Construction Manager and the Owner shall be
> released and discharged of and from any claims for

> damages which Subcontractor may have on account of
> any cause of delay, whether or not specifically
> stated herein, except as provided in Exhibit G.

(JX-1 at 9)(emphasis added). However, Ragghianti contends
that once again Exhibit G, Section 9 (as referenced above)
provides for an exception to Article 8.4.

Ragghianti further cites to Article 9.1 to bolster its
argument that an exception to Article 8.4 exists:

> The Construction Manager may, at any time,
> unilaterally or by agreement with Subcontractor,
> without notice to the sureties, make changes in the
> Subcontractor's Work. * * * Subcontractor shall be
> entitled to submit a change order request for
> changes affecting its work in accordance with
> [Article] 9.2.

(JX-1 at 10).

Article 9.2 states:

> Subcontractor shall submit to The Construction
> Manager any requests or claims for adjustment in
> the Subcontract Price, schedule or other provisions
> of this Subcontract for changes directed by The
> Construction Manager, as a result of deficiencies
> or discrepancies in the Contract Documents, or for
> circumstances otherwise permitted by the Contract
> Documents. Said requests or claims shall be
> submitted in writing by Subcontractor in time to
> allow The Construction Manager to comply with the
> applicable provisions of the Contract Documents
> regarding requests and/or claims to or against the
> Owner. * * * Subcontract adjustments shall be made
> only to the extent that The Construction Manager is

40

>       entitled to and obtains relief from or must grant
>       relief to the Owner.

(Id.).

However, according to PRBC, even if these provisions can be read to allow Ragghianti damages for delay, Ragghianti's rights and obligations shall be the same as the rights and obligations of PRBC under the Prime Contract. (See Doc. # 162 at 37). This Court agrees. Although Ragghianti is in fact entitled to the same rights and obligations of PRBC under the Prime Contract, as previously discussed, the FAR provisions that govern the Prime Contract do not allow for the delay damages Ragghianti is seeking. (Id.).

Furthermore, as argued by PRBC, irrespective of whether or not Ragghianti was terminated for default or convenience or whether its claimed damages are barred by Article 33, PRBC argues that Ragghianti's pre-termination claims and its post-termination claims for delay-related home office overhead damages and loss of anticipatory profits, are all barred, for its failure to provide the required notice under Article 9.4:

>       If Subcontractor considers any action or inaction
>       by The Construction Manager other than a formal
>       change order to be a change, it shall so notify The
>       Construction Manager within seven (7) days of said
>       action or inaction and seek a confirmation from the
>       Construction Manager.  Failure to comply with said
>       confirmation procedure shall constitute a waiver of

> the right to compensation for the action or
> inaction.

(JX-1 at 10).

There was no evidence presented at trial that Ragghianti gave any notice of its claims for total unearned profit or increased costs of performance at any time before it was terminated and certainly not within 7 days of the action or inaction on the part of PRBC which allegedly caused those damages. There is also no evidence that PRBC waived the notice requirement under the Subcontract. (Doc. # 162 at 38-39)(citing Emerald Forest Util. Dist. v. Simonsen Const. Co., 679 S.W.2d 51, 54 (Tex. App. 1984)("The requirement that notice of delays in construction must be in writing for the contractor to invoke certain rights under a construction contract [is] valid.").

For the reasons stated above, Ragghianti is not entitled to unearned lost profits, unabsorbed home office overhead damages, and increased costs attributable to delay. These damages equate to anticipatory profits and consequential damages, which are not allowed under the Subcontract, the Prime Contract, and the cited FAR provisions. Ragghianti is entitled only to the outstanding payment for the work it

completed at the time of its termination, which amounts to $392,000. (See Doc. # 162 at 23).

### D. Ragghianti's Miller Act Claim Against PRBC's Sureties

"The purpose of a Miller Act payment bond is to protect subcontractors and suppliers who provide labor and material for a federal project. . . ." United States for Use & Benefit of Pertun Const. Co. v. Harvesters Grp., Inc., 918 F.2d 915, 917 (11th Cir. 1990). "To effectuate this congressional intent, the Miller Act is to be liberally construed and applied." Id. But a liberal construction does not mean that the Miller Act establishes an unlimited basis for recovery; courts have held that the Miller Act surety is not liable for damages caused by the prime contractor's breach of contract. Id.; see, e.g., United States for Use & Benefit of Edward E. Morgan Co., Inc. v. Md. Cas. Co., 147 F.2d 423 (5th Cir. 1945).

The Miller Act requires a general contractor on a federal construction project to furnish a payment bond for the protection of all persons supplying labor and material in the prosecution of the work provided for in the contract. United States ex rel. Capital Computer Grp., LLC v. Gray Ins. Co., 453 F. App'x 905, 906 (11th Cir. 2011) (citing 40 U.S.C. § 3131(b)(2)). Under the Miller Act, "'every person who has

furnished labor or material' used in a project *may* recover against a Miller Act surety." Mail Steel Serv. Inc. v. Blake Constr. Co., 981 F.2d 414, 417 (9th Cir. 1992)(emphasis added).

A Miller Act plaintiff is entitled to recover under the bond the out-of-pocket labor and expenses attributable to delays. Pertun Constr. Co., 918 F.2d at 918-19. Further, a subcontractor can recover from the Miller Act surety for labor and material furnished despite non-payment by the government to the contractor. United States for Use & Benefit of Lochridge-Priest, Inc. v. Con-Real Support Grp., Inc., 950 F.2d 284, 288 (5th Cir. 1992).

Ragghianti submits that it is entitled to damages for delay against PRBC's Sureties as PRBC never afforded Ragghianti an extension of time, and further, the language of the Subcontract otherwise provides for delay claims. (Doc. # 161 at 64).

As previously indicated, Article 8.4 states in pertinent part:

> Subcontractor shall not be entitled to any claim for damages (including but not limited to claims for delay, accelerations, time impact, extended general conditions, extended field or home office overhead, loss of profits, loss of use, equipment rental) on account of hindrances or delays from any cause whatsoever. An extension of time shall be

> Subcontractor's sole and exclusive remedy for any
> occurrence giving rise to a delay and The
> Construction Manager and the Owner shall be
> released and discharged of and from any claims for
> damages which Subcontractor may have on account of
> any cause of delay, whether or not specifically
> stated herein, except as provided in Exhibit G.

(JX-1 at 9).

However, Ragghianti contends that there is an exception
to Article 8.4 – Exhibit G Section 9. According to Ragghianti,
this provision does not include a "no damages for delay
clause," as argued by PRBC, but instead states:

> The rights and obligations of Subcontractor shall
> be the same as the rights and obligations of the
> Construction Manager under the General Terms and
> Conditions of the Prime Contract.
>
> * * *
>
> Any claims by Subcontractor for delay or additional
> cost must be submitted to [PRBC] three (3) business
> days prior to the time, and in the manner, in which
> [PRBC] must submit such claims to the Owner, and
> failure to comply with such conditions for giving
> notice and submitting claims shall result in the
> waiver of such claims.

(JX-8).

Ragghianti further argues that even if Article 8.4 was
construed as a "no damages for delay clause," Texas law
includes other exceptions to enforcement of a no damage for
delay clause. (Doc. # 161 at 66)(citing Green Int'l, Inc. v.

Solis, 951 S.W. 2d 384, 387 (Tex. 1997)). The exceptions are
when the delay:

> (1) was not intended or contemplated by the parties
> to be within the purview of the provision; (2)
> resulted from fraud, misrepresentation, or other
> bad faith on the part of one seeking the benefit of
> the provision; (3) has extended for such an
> unreasonable length of time that the delayed party
> would have been justified in abandoning the
> contract; or (4) is not within the enumerated
> delays to which the clause applies.

(See Id.). Ragghianti submits that its evidence presented at
trial demonstrates that "delay was caused by PRBC's
prodigious mismanagement and related events, material changes
to the Subcontract, as well as active interference by PRBC
and its privies, thus negating its enforcement of the no
damage for delay clause, if any." (Doc. # 161 at 66).

Accordingly, Ragghianti posits that it is entitled to
recover unpaid furnished labor and material, for burdens not
contemplated by the Subcontract, delay damages, lost profits
and unabsorbed home office overhead from Sureties in the
amount of $520,735.23. (Id. at 67). However, should the Court
find that Ragghianti is not entitled to lost profit in its
Miller Act Claim, Ragghianti asserts that the total claim
amount is $398,550. (Id.).

PRBC takes issue with Ragghianti's position as (1) Ragghianti's total cost claim is not permitted under either Texas or Federal Law and (2) Ragghianti's "delay damages" are expressly barred by the "no damages for delay" clause in Article 8.4. (See Doc. # 139). This Court has already found that Ragghianti's claim is not a "total cost claim." Therefore, the Court will analyze whether Ragghianti's damages against PRBC's Sureties are barred by the terms of the Subcontract.

As this Court has previously determined, Ragghianti – as the Miller Act Plaintiff – is entitled to recover under the bond the out-of-pocket labor and material costs attributable to delays. See Pertun Constr. Co., 918 F.2d at 918. However, a damage claim against a surety that does not flow directly and immediately from actual performance is barred by the Miller Act. United States for Use & Benefit of T.M.S. Mech. Contractors, Inc. v. Millers Mut. Fire Ins. Co. of Tex., 942 F.2d 946, 952 (5th Cir. 1991)("The subcontractor can only recover from the surety for additional or increased costs *actually* expended in furnishing the labor or material in the prosecution of the work provided for in the contract and *attributable to the delay*.")(emphasis in original).

Further, "[A] subcontractor cannot recover on a Miller Act payment bond for the cost of labor and materials provided after the termination of work under a government construction project" Id. at 953, and cannot recover the profits on out-of-pocket expenditures attributable to delay. See Id. (concluding that a subcontractor cannot recover from a Miller Act surety the profits on out-of-pocket expenditures attributable to delay. A claim for profit does not involve actual outlay and thus "falls outside both the letter and the spirit of the [Miller] Act."); United States for Use & Benefit of Otis Elevator Co. v. Piracci Constr. Co., 405 F. Supp. 908, 910 (D.D.C. 1975) (holding that although subcontractor could recover out-of-pocket expenditures attributable to delay, subcontractor could not recover from surety for profit of ten percent of direct and indirect additional costs).

Therefore, Ragghianti is not entitled to any anticipated lost profits, and any of Ragghianti's unabsorbed overhead, increased labor, and material costs *beyond* the scope of its Subcontract with PRBC is unrecoverable against PRBC's Sureties. Thus, Ragghianti's entitlement to damages, if any, is limited to those "sums or sums justly due for labor or materials *furnished in the performance of its agreement* to work [on the Project]," which includes liability for all out-

of-pocket expenditures for that labor or material, including additional or increased expenditures caused by delay. See Pertun Constr. Co., 918 F.2d at 919 (emphasis added).

"A surety's liability under the Miller Act is measured by the general contractor's liability under the construction contract." Consol. Elec. & Mechanicals, Inc. v. Biggs Gen. Contracting, Inc., 167 F.3d 432, 435 (8th Cir. 1999). Therefore, in order for this Court to determine PRBC's Sureties' liability, it must look to PRBC's liability. This Court has previously determined that the Subcontract, which affords Ragghianti the same rights as PRBC has against the Owner in the Prime Contract, does not allow for anticipatory profits and consequential damages. Furthermore, the Court found that the evidence presented at trial demonstrates that Ragghianti failed to provide adequate notice to PRBC of its "delay damage" in accordance with Article 9.4. Therefore, this Court finds that PRBC's Sureties are liable to the same extent as PRBC; PRBC's Sureties' liability is limited to Ragghianti's unpaid furnished labor and materials (i.e., Ragghianti's total outstanding balance).

To the extent Ragghianti seeks attorneys' fees against PRBC's Sureties, by way of Fed. R. Civ. P. 54 motion, the Court finds that Ragghianti is barred from doing so. "It is

49

undisputed that attorneys' fees cannot be awarded in Miller Act claims absent an enforceable contract provision or evidence of bad faith." <u>United States for Use of Varco Pruden Bldgs. v. Reid & Gary Strickland Co.</u>, 161 F.3d 915, 918 (5th Cir. 1998)(citing <u>F.D. Rich Co., Inc. v. United States for the Use of Indus. Lumber Comp., Inc.</u>, 417 U.S. 116, 126–31 (1974)); <u>United States for Use of L.K.L. Assocs. v. Crockett & Wells Const., Inc.</u>, 730 F. Supp. 1066 (D. Utah 1990)(finding that an attorney's fees provision must be included in either the general contract or the payment bond).

Ragghianti has failed to point to a provision in the Subcontract or payment bond that would entitle Ragghianti to attorneys' fees against the Sureties. Therefore, Ragghianti's clam for attorneys' fees against PRBC's Sureties is barred as a matter of law.

**E. <u>Ragghianti's Cardinal Change Claim Against PRBC and PRBC's Sureties</u>**

In the alternative, Ragghianti sets forth a cardinal change claim for recovery against PRBC and its Sureties for work done outside the terms of the Subcontract and for the benefit of the Prime Contract. (Doc. # 59 at 8; Doc. # 161 at 67). Specifically, Ragghianti posits that PRBC imposed a

50

series of changes which amounted to a cardinal change to the

Subcontract:

> PRBC repeatedly pushed back the start date and
> accelerated and condensed subsequent work in an
> attempt to catch up, changed the method and
> conditions of grade beam construction, resequenced
> the grade beam work to quadrants when it was
> originally to be performed from end to end, added
> Dalcan laborers working in tight space at cross-
> purposes to Jack Daniels, erected the steel prior
> to the slab on grade, failed to timely perform
> waterproofing of preceding work, forcing Jack
> Daniels to work around huge piles of excavated dirt
> that could not be back-filled pending [PRBC's]
> waterproofing, and start and stop work throughout
> the day to accommodate steel erectors. [PRBC's]
> actions required [Ragghianti] to employ a special
> concrete pump to pump concrete up, over, and
> through the erected steel, then failed to provide
> the larger pad required for the truck's setup, and
> larger crews were necessary to pour and finish the
> concrete. [PRBC] changed the construction schedule
> and sequence, failed to provide access to work
> areas, failed to timely make submittals and obtain
> materials such as concrete blankets, failed to
> properly perform preceding work, kept [Ragghianti]
> and Jack Daniels' crews standing around awaiting
> work, engaged in continuous changing of schedules
> and compressing of work, failed to make timely
> payment, and did not respond to requests for
> information.

(Doc. # 146 at 4-5).

Ragghianti argues that these changes were more than

"delays, interruptions and inconveniences," as argued by PRBC

(Doc. # 139 at 5), but that when taken as a whole, are more than sufficient to support a cardinal change. (Doc. # 146 at 6). Therefore, Ragghianti submits that it is entitled to recover from PRBC and its Sureties its resulting damages and expenses, and amounts unpaid for work performed, costs of delay, acceleration, interference and changes to its work and in having been prevented from completing its work in quantum meruit, in the amount of $398,550. (Doc. # 161 at 69); see United States, for Use of C.J.C., Inc. v. W. States Mech. Contractors, Inc., 834 F.2d 1533, 1549 (10th Cir. 1987)("[T]he subcontractor may recover in quantum meruit where it has performed work outside the terms of the contract that benefits the prime contractor.").

Conversely, PRBC argues that Ragghianti's cardinal change claim only involves "[a] series of small changes" including delays, interruptions, and inconveniences, none of which establish that PRBC required Ragghianti to perform duties materially different from those it originally bargained for. (Doc. # 139 at 5). Instead, the proof adduced at trial is that all of the changes arise out of the Subcontract and no evidence has been introduced to support a cardinal change claim. (See Doc. # 139 at 4-6).

"The cardinal change doctrine is not a rigid one." <u>Edward</u>
<u>R. Marden Corp. v. United States</u>, 442 F.2d 364, 369 (Ct. Cl.
1971). "Its purpose is to provide a breach remedy for
contractors who are directed by the Government to perform
work which is not within the general scope of the contract."
<u>Id.</u> "In other words, a cardinal change is one which, because
it fundamentally alters the contractual undertaking of the
contractor, is not comprehended by a normal [c]hanges
clause." <u>Id.</u>; see <u>Krygoski Constr. Co., Inc. v. United States</u>,
94 F.3d 1537, 1543 (Fed. Cir. 1996) (A cardinal change is a
breach that occurs "when the Government effects a [change] in
the work so drastic that it effectively requires the
contractor to perform duties materially different from those
in the original bargain.").

In order to prove a cardinal change claim, the plaintiff
must show that it had imposed on it work that "fundamentally
alters the contractual undertaking" such that the altered
work was not redressable under the "change clause" of the
contract. <u>Edward</u>, 442 F.2d at 369. The cardinal change
doctrine asks whether the changes were outside the
contemplation of the bargained for performance. (<u>See</u> Doc. #
161 at 71). "A modification generally falls within the scope
of the original procurement if potential bidders would have

53

expected it to fall within the contract's changes clause."
AT&T Commc'ns, Inc. v. Wiltel, Inc., 1 F.3d 1201, 1205 (Fed.
Cir. 1993).

As provided for in Wunderlich Contracting Company v.
United States, 351 F.2d 956 (1965), there is no automatic or
easy formula which can be used to determine whether a change
(or changes) is beyond the scope of the contract and,
therefore, in breach of it. "Each case must be analyzed on
its own facts and in light of its own circumstances, giving
just consideration to the magnitude and quality of the changes
ordered and their cumulative effect upon the project as a
whole." Id. A cardinal change, however, does not arise if
"[t]he contract itself explicitly provide[s] that
discrepancies, omissions, conflicts and design changes would,
or likely, would arise, and that the parties would address
such issues during contract performance." Metcalf Const. Co.,
Inc. v. United States, 102 Fed. Cl. 334, 367 (Fed. Cl. 2011);
Int'l Data Prods. Corp. v. United States, 492 F.3d 1317, 1325
(Fed. Cir. 2007)(finding that the change fell under express
warranty and upgrade clauses of the contract; thus was not a
cardinal change); Gen. Dynamics Corp. v. United States, 585
F.2d 457, 466 (Ct. Cl. 1978)(finding that the record did not

provide for cardinal change as all changes ordered were within the scope of the contract).

Ragghianti cites Edward R. Marden Corp., to support its position that the present circumstances materially altered the nature of Ragghianti's undertaking and required work which was not essentially the same work as the parties bargained for when the contract was awarded. (Doc. # 146 at 7). In Edward, the plaintiff alleged that the specifications were defective and that the whole project resulted in increased costs of $3,700,000. 442 F.2d at 370. The court found that the claims were not ones encompassed by the changes clause of the contract, but rather involved major reconstruction, and resulted in increased costs of almost double the contract price. Id. The court's decision – the claim was not encompassed by changes clause - was "based on the sheer magnitude of reconstruction work caused by the alleged defective specifications." Id.; see also SW Bell Tel. Co. v. Chrisman Constr. Co., Inc., 529 S.W. 2d 586, 587 (Tex. Civ. App. 1975)(affirming trial court's finding that change in required backfill material and thickness of manhole walls resulted in extra work under Texas law, which was sufficient to support a claim for quantum meruit, though end product was essentially the same).

Here, the Court finds that the evidence provided at trial fails to establish Ragghianti's entitlement to damages based on a theory of cardinal change. Ragghianti provides a laundry list of items it claims rises to the level of a cardinal change. However, this Court finds that although not merely delays, interruptions, and inconveniences, the changes and modifications were reasonably expected and fell within the scope of completion for the Subcontract.

Ragghianti provides that "it bid the job to a schedule that showed its performance in an orderly sequence, the piers, followed by grade beams installed across the project, slab on grade (after which the steel subcontractor would arrive), and site concrete and sidewalks. Therefore, the changes and modifications resulted from PRBC's mismanagement and its continually changing contractual requirements." (Doc. # 146 at 6). However, these allegations alone do not persuade the Court to find a cardinal change.

PRBC and Ragghianti entered into a Subcontract with Ragghianti to provide the building foundation, slab on grade, miscellaneous concrete and site concrete to the Project. (Doc. ## 59 at ¶ 9; 59-1; 95 at 1; 96 at 2; Ragghianti Dep. Doc. # 96-10 at 17; JX-1; JX-2 at 1; JX-3 at 1). None of the changes or modifications presented by Ragghianti demonstrate

that Ragghianti's undertaking of the Project was materially altered or that PRBC required work from Ragghianti that was not essentially the same work as the parties bargained for when the contract was awarded. The work Ragghianti was required to do as a result of PRBC's changes was necessary for the completion of the Project; thus, the work done was not a cardinal change. See Brown-McKee, Inc. v. W. Beef, Inc., 538 S.W. 2d 840, 844 (Tex. Civ. App. 1976)("the work and consequent expense incurred in digging in rock was necessary in the performance of the very thing which [plaintiff] contracted to do.").

Furthermore, Article 9.2 provides:

Subcontractor shall submit to The Construction Manager any requests or claims for adjustment in the Subcontract Price, schedule or other provisions of this Subcontract for changes directed by The Construction Manager, as a result of deficiencies or discrepancies in the Contract Documents, or for circumstances otherwise permitted by the Contract Documents.

(JX-1 at 10). The changes and modifications referenced by Ragghianti are covered by Article 9.2, which provides Ragghianti with an adequate procedure to obtain relief for the changes and modifications imposed by PRBC.

For the reasons stated above, the Court finds in favor
of PRBC and its Sureties as to Ragghianti's alternative
cardinal change claim as Ragghianti has not established that
PRBC's actions effected a cardinal change.[4]

**F. PRBC's Indemnity Claim Against Ragghianti**

Count I of PRBC's Amended Counterclaim is an action for
contractual indemnification against Ragghianti and its surety
American Safety. (Doc. # 64). Noteworthy, however, on
February 20, 2014, PRBC dismissed its claim against American
Safety. (Doc. ## 127, 128). Therefore, Count I of the PRBC's
Amended Counterclaim remains only as to Ragghianti.

According to PRBC, Ragghianti is liable to PRBC under
Article 6.2 for all costs PRBC incurred to correct
Ragghianti's "defective work." (Doc. # 162 at 24). Article
6.2 states:

> To the fullest extent permitted by law,
> Subcontractor shall indemnify, defend and hold
> harmless The Construction Manager, Prime Contract
> and the Owner, any other entity entitled to
> indemnification under the Contract Documents, and
> their respective employees . . . to the extent said
> Losses arise out of Subcontractor's actual failure

---

[4]   As this Court finds that Ragghianti has failed to
establish that PRBC's actions amounted to a cardinal change,
the Court declines to address PRBC's contention that
Ragghianti failed to protest the changes imposed by PRBC.
(See Doc. # 139 at 6).

to perform this Subcontract in accordance with the terms of this Subcontract and the Contract Documents. The foregoing obligations of Subcontractor shall include, but are not limited to, indemnifying, defending and holding harmless the Indemnified Parties from claims made by third parties against any Indemnified Party to the extent such claims arise out of the negligence, acts or omissions of the Subcontractor. Subcontractor's liability includes, but is not limited to, (1) damages, delay costs, increased costs of performance, warranty, rework and repair costs; (2) liability to third parties, including, but not limited to, other subcontractors of The Construction Manager and Prime Contract or Owner's other contractors; (3) attorney's fees and related costs.

(JX-1 at 7).

Furthermore, PRBC states that pursuant to Article 14.1, Ragghianti was obligated to replace or correct any of its work that PRBC or the Owner rejected as failing to conform to the requirements of the Subcontract within a "reasonable time." (Doc. # 162 at 31). Article 14.1 states in relevant part:

Subcontractor shall promptly replace or correct any of Subcontractor's work which The Construction Manager or the Owner shall reject as failing to conform to the requirements of this Subcontract. If Subcontractor does not do so within a reasonable time, The Construction Manager shall have the right to do so and Subcontractor shall be liable to The Construction Manager for all losses on account thereof.

(JX-1 at 12).

Both PRBC and the Corps rejected Ragghianti's defective slab pour on February 14, 2012. (Doc. # 162 at 31; Samuel Parker Dep. Doc. # 118-1 at 142-43). Furthermore, Ragghianti breached its obligation under Article 14.1 to correct this defective work when it failed to have its workers, who were on the Project on February 17-18, 20-21, 2012, begin removing the slab. (PX-31). Therefore, PRBC is entitled to recover its costs to correct the defective work, in the amount of $827,457.

### 1. **Whether PRBC Was in Prior Breach of Subcontract**

Ragghianti contends that PRBC is precluded from obtaining damages, as it breached the Subcontract. (Doc. # 161 at 82). The established rule of law in Texas is that "a party to a contract who is himself in default cannot maintain a suit for its breach." Dobbins v. Redden, 785 S.W. 2d 377, 378 (Tex. 1990). Here, Ragghianti argues that PRBC is in prior breach of the Subcontract as it did not make payment of Ragghianti's January of 2012, requisition, despite having received payment from the Corps. (Doc. # 161 at 83). Thus, according to Ragghianti, PRBC did not comport with the FAR's Prompt Payment Act, which is incorporated in the Subcontract,

or perform in accordance with its agreement to pay Ragghianti every two weeks. (Id.; JX-13 at 86).

However, PRBC argues that it was not in prior breach by its failure to pay Ragghianti contract sums through the fall of 2011, as evidence showed that the justification for non-payment was PRBC's receipt of several notices from Ragghianti's suppliers that Ragghianti had failed to make payment to them. (Doc. # 162 at 32; Doc. # 151 at 51-60). Namely, starting on September 15, 2011, PRBC received a notice from a supplier of Ragghianti – ASCO - that it had not been paid by Ragghianti for work previously performed. (DX-105). PRBC became concerned that Ragghianti was not paying its suppliers, and thus, declined to process payment to Ragghianti until these supplier payment issues were resolved. (Doc. # 151 at 51-60).

According to PRBC, it had the right to withhold payment if it became aware that Ragghianti had not made payments to its lower-tier subcontractors, pursuant to Article 4.14(1):

> The Construction Manager *may* withhold approval of Application for Payment and/or monthly progress payments in an amount sufficient to protect The Construction Manager because:
>
> (1) The Construction Manager receives information that Subcontractor may not have made payments

> properly to its Lower-Tier Subcontractors or for
> labor (including fringe benefits), materials or
> equipment, transportation or shipping costs, taxes,
> fees or any other claims arising out of
> Subcontractor's Work and Subcontractor fails or
> refuses to produce proof requested by The
> Construction Manager that such payments have been
> made[.]

(JX-1 at 6)(emphasis added). Indeed, two other vendors,
Capital pumping and Labor Ready also supplied notices to PRBC
that Ragghianti had not paid them. (Doc. # 151 at 51-60; DX-
106).

The language provided in Article 4.14 is clear that PRBC
– as the Construction Manager – had the right to withhold any
payments until Ragghianti submitted evidence satisfactory to
PRBC that all amounts owed in connection with the performance
of the Subcontract have been paid. Therefore, as PRBC received
notice that Ragghianti had failed to pay several of its lower-
tier subcontractors, PRBC was not in breach when it withheld
Ragghianti's January of 2012, payment.

### 2. Whether Indemnification Provisions Must Comply with the Express Negligence Doctrine

Ragghianti further argues that the indemnity provisions
PRBC relies upon are unenforceable as they are subject to,
and fail to satisfy, Texas's Express Negligence Doctrine.
(Doc. # 161 at 37).

The Court notes, however, that in its Order denying the parties' cross-motions for summary judgment, this Court found that the Subcontract's indemnity provisions were not required to conform to the Express Negligence Doctrine. (See Doc. # 114). Ragghianti admits that:

> [T]he Subcontract's provisions may be read to only require [Ragghianti] to indemnify [PRBC] from claims arising out of the negligence, acts or omissions of [Ragghianti] or [Ragghianti's] subcontractors. However, because [PRBC] seeks indemnification for [Ragghianti's] performance under the contract, and [PRBC's] own actions directly, indirectly, continuously, and negatively impact [Ragghianti's] performance and ability to perform, [PRBC] is necessarily and impermissibly seeking indemnity for its own actions.

(Doc. # 155 at 12); see Am. Eurocopter Corp. v. CJ Sys. Aviation Grp., 407 S.W. 3d 274, 289 (Tex. App. 2013)(noting that "The [Express Negligence Doctrine] also applies to situations where the indemnitee's negligence proximately causes injury jointly and concurrently with the indemnitor's negligence."). Therefore, Ragghianti argues that "Because [PRBC] is seeking indemnification from [Ragghianti] for damages that [PRBC] directly and indirectly caused, the claim is subject to Texas's Express Negligence Doctrine, and the Subcontract must specifically express an intent that

[Ragghianti] must indemnify [PRBC] from its own negligence." (Doc. # 155 at 16).

As articulated by PRBC, "This Court has already held that the express negligence doctrine is inapplicable to the [Subcontract's] indemnity provision, and that the provision remains enforceable under Texas law." (Doc. # 159 at 10). Specifically, the Court's previous Order stated:

> Upon review of the Subcontract, the Court finds that the relevant contractual provisions do not require Ragghianti to indemnify PRBC for PRBC's own negligence. In fact, the provisions, read collectively, express that Ragghianti is to indemnify PRBC from claims arising out of the negligence, acts or omissions of Ragghianti or Ragghianti's Lower Tier Subcontractor – Jack Daniels – not the negligence of PRBC. As the provisions are not contemplating indemnification for PRBC's own negligence, the express negligence doctrine is inapplicable.

(Doc. # 114 at 24-25).

This Court stands by its previous decision and holds that the indemnity provisions relied upon by PRBC are not required to conform with Texas's Express Negligence Doctrine. Therefore, this Court declines to allow Ragghianti to relitigate this matter.

### 3. **Whether PRBC Failed to Apportion its Damages**

Finally, Ragghianti argues that PRBC failed to apportion its damages in regard to its indemnity claim as the indemnity

claim relies on the same proof to establish damages that PRBC uses in its termination for convenience or default analysis. (Doc. # 161 at 84). Ragghianti submits that "[t]he measure of damages in contracts of indemnity is not the amount of liability allegedly incurred, but the amount actually paid by the person indemnified that is properly attributable to [Ragghianti's] 'actual failure to perform [the] Subcontract in accordance with [its] terms. . . .'" (Id.)(citing In re Lathrop Haskins & Co., 216 F. 102, 106-07 (2d Cir. 1914)("[T]he measure of damages in contracts of indemnity is not the amount of liability incurred, but the amount actually paid by the person indemnified on account of the loss.").

According to Ragghianti, PRBC seeks indemnity for expenses that are attributable to overcoming the delay PRBC itself created. (Doc. # 155 at 18). However, as PRBC fails to provide any concurrent delay analysis, Ragghianti argues that PRBC is precluded from recovery of claims that include an acceleration component. (Id.). "Just as [Ragghianti] and Jack Daniels presented opinion testimony of [PRBC's] impact in causing delay and calling for acceleration of their work, [PRBC] had to present evidence through an expert witness to apportion delay associated with Ragghianti's work from its own delay and delay caused by its privies." (Id.).

However, PRBC states that it is "simply not seeking any damages that have an acceleration or delay component to them and thus any failure to provide concurrent delay analysis does not preclude PRBC's recovery for its indemnification claims." (Doc. # 159 at 13). Instead, PRBC is requesting "the costs it actually incurred to rip out the defective concrete, to replace the defective concrete and to complete [Ragghianti's] unfinished scope of work. PRBC is not seeking acceleration costs, liquidated damages, extended general conditions or other damages dependent upon a concurrent delay analysis or apportionment of delay." (Doc. # 159 at 13).

PRBC is not seeking delay damages. In fact, the Court notes that in a previous Order, this Court found that PRBC had abandoned its claim of delay and liquidated damages in this case. (Doc. # 114 at 20). Instead, PRBC is requesting costs actually incurred in replacing Ragghianti's defective work. Therefore, the Court finds that Ragghianti is incorrect in its position that PRBC had to present expert testimony on the apportionment of delay associated with Ragghianti's work from its own delay, as no apportionment was necessary.

For the reasons set forth above, the Court finds in favor of PRBC on its Indemnity claim.

### G. **PRBC's Breach of Contract Claim Against Ragghianti**

Ragghianti submits that PRBC cannot maintain its breach of contract claim or recover attorneys' fees because, among other reasons, PRBC first breached the Subcontract and its attorneys' fees are an element of damages under the provisions it relies upon. (Doc. # 161 at 85). This Court has previously determined that PRBC did not breach the Subcontract by withholding payment from Ragghianti. Thus, this Court will analyze Ragghianti's additional arguments as to why PRBC is not entitled to its breach of contract claim.

## 1. **Whether PRBC's Damages are Premature & Speculative**

According to Ragghianti, PRBC failed to present evidence of final acceptance of the concrete work, or final billing, and therefore, the contents of PRBC's claims and final invoicing to the Owner are unknown. (Doc. # 161 at 86). As a result, Ragghianti contends that PRBC's default damage claim is premature and speculative. (_Id._).

Article 10.1(ii) of the Subcontract states in pertinent part:

> In case of termination for default, _Subcontractor_ shall not be entitled to receive any further payment until _Subcontractor's Work_ shall be fully completed and accepted in accordance with the provisions of the Prime Contract with the Owner and Payment therefore has been made in full by the Owner.

(JX-1 at 11)(emphasis added). Ragghianti submits that the amount of any future offset is unknown until the work is accepted by the Owner and PRBC is paid for it, making PRBC's claim impermissibly speculative. (Doc. # 161 at 86)(citing Wis. Elec. Power Co. v. United States, 90 Fed. Cl. 714, 792-93 (Fed. Cl. 2009)).

At trial, the following questioning of Charles Ernest Edgar – general counsel for Atkins North America, the parent company for both PBS&J and PRBC - occurred:

> A: To be clear, there was only one [Request for Equitable Adjustment (REA)] submitted to the government, and the government took no action, returned it to us. And that is where the REA activity stands right now.
>
> * * *
>
> Q: All right. And there also has not been a final payment application submitted to the government yet, correct?
>
> A. That's correct.
>
> Q: And so the project has not be finally accepted by the government, correct?
>
> A. No. It was substantially complete on May 15th, 2013, which then allowed the government to take occupancy.
>
> The government didn't want us to complete some additional scope that they added. So final

completion occurred – I don't remember the exact
date, but it was the end of October of 2013.

There are still warranty responsibilities that we
have on the project, and those are being resolved
as well.

Q: And no final payment has been issued, of course,
because final billing hasn't been presented?

A. That's correct.

(Doc. # 151 at 234, 241). Therefore, as no final billing has
been presented, Ragghianti argues that PRBC cannot recover
damages under its termination for default theory. This Court
disagrees.

The language of Article 10.1 explicitly states that "In
case of termination for default, *Subcontractor* shall not be
entitled to receive any further payment until *Subcontractor's
Work* shall be fully completed and accepted in accordance with
the provisions of the Prime Contract." (JX-1 at 11)(emphasis
added). Nowhere in Article 10.1 does it indicate that PRBC is
unable to receive payment from Ragghianti, as a result of
Ragghianti's defective performance, prior to final acceptance
and payment by the Owner.

Although no final payment has been issued to the Owner,
final completion of the Project has occurred and, as a result,
PRBC is able to determine its damages to date as a result of

Ragghianti's defective performance under the Subcontract. Therefore, the Court does not find PRBC's damages speculative or premature.

### 2. Measure of Damages

According to PRBC, the sum total of the default damages PRBC incurred to remove and replace the defective slab and complete Ragghianti's scope of work was $827,457, and this amount must be offset by Ragghianti's unpaid contract sum of $392,000. (See Doc. # 162 at 23). Therefore, the net total damages resulting from Ragghianti's breach are $435,457. (See Id.; Doc. # 152 at 76).

Ragghianti submits that under Texas law, the measure of damages for defective construction is "the difference in value of the structure in its defective state versus as planned or the cost to repair it if repair does not constitute economic waste." (Doc. # 161 at 86)(citing Jacobini v. Zimmerman, 487 S.W. 2d 249, 251 (Tex. App. 1972)); see also Fid. & Deposit Co. of Maryland v. Stool, 607 S.W. 2d 17, 20 (Tex. Civ. App. 1980)("Texas courts have long held that where defects in construction of a building may be remedied, the measure of damages for the owner is the cost of such remedy or repair, but where such defects cannot be remedied without injury to the structural efficiency of the building as a

whole, the measure of damages is the difference between the value of the building as constructed and its value had it been constructed according to the contract.").

Ragghianti suggest that, "In this case, the cost to repair the defect would be the proper measure of damages, a legal conclusion recognized and concurred with by PRBC's delay claim expert, who notes PRBC seeks damages based on the February 14, 2012, pour but speculates that the repair costs should be similar." (Doc. # 161 at 87).  Notwithstanding this baseline proposition in construction law, Ragghianti points out that PRBC has "continuously included costs incurred for the February 14, 2012[,] pour in its damages claim." (Id.). According to Ragghianti, these damages are not the cost of repair, and therefore, not recoverable. (Id.).

PRBC's termination for default damages consist of the costs it actually incurred and paid to remove and replace the defective slab and complete Ragghianti's scope of work. PRBC has provided detailed explanation for each cost incurred. For example, in regards to the damages incurred as to Ingram Concrete, PRBC provides "The invoice used to support the charge of $13,298 was the invoice from the February 14th pour." (See Doc. # 162 at 20). The Court notes that at trial Steve Bennett testified that using the actual February 14,

2012, invoice was the better method to determine how much the concrete that was ripped out cost, rather than using an invoice from the subsequent March 27, 2012, Cantera pour and backing into a calculation. (<u>Id.</u>; Doc. # 151 at 270-71).

Therefore, although this Court agrees with Ragghianti that the proper measure of damages is "the difference in value of the structure in its defective state versus as planned or the cost to repair it if repair does not constitute economic waste," the Court finds that PRBC has provided adequate explanation of its damages, including why it included costs incurred for the February 14, 2012, pour in its damages claim.

### 3. **Whether PRBC Provided Sufficient Evidence to Establish Damages Were Reasonable and Necessary**

Under Texas law, "[t]he party seeking to recover the cost of completion in a breach of contract case has the burden to prove that the damages sought are reasonable." <u>Mustang Pipeline Co., Inc. v. Driver Pipeline Co., Inc.</u>, 134 S.W. 3d 195, 200 (Tex. 2004). To prevail in an action for costs of repair or completion, the damages sought must be both reasonable and necessary. <u>City of Alton v. Sharyland Water Supply Corp.</u>, 402 S.W. 3d 867, 876-77 (Tex. App. 2013). Mere evidence of out-of-pocket costs is insufficient to support a damages award absent competent proof that the expenditures

were reasonable and necessary. <u>Mustang Pipeline Co., Inc.</u>,
134 S.W. 3d at 201 ("it is now well settled that proof of the
amounts charged or paid does not raise an issue of
reasonableness, and recovery of such expenses will be denied
in the absence of evidence showing that the charges are
reasonable.").

"In order to establish that repairs are necessary and
reasonable, the magic words 'reasonable' and 'necessary' need
not be used; the injured party need only present sufficient
competent testimony so that the trier of fact is justified in
concluding that the repairs are necessary and that the cost
of repair is reasonable." <u>Carrow v. Bayliner Marine Corp.</u>,
781 S.W. 2d 691, 694 (Tex. App. 1989). Although Ragghianti
asserts that Texas law requires that testimony about
reasonableness must come from the person who actually
prepared the estimate of the costs, or an expert in the field,
"[t]here is simply no requirement that reasonableness can
only be established through the testimony of the preparer of
an estimate or an expert." (Doc. # 159 at 3).

Ragghianti relies on the fact that PRBC's expert said he
was not qualified to testify in regard to "construction
estimating of labor services, equipment, or materials on the
. . . Project. . . ." (Doc. # 151 at 251-52). However, at

trial PRBC presented ample evidence to support a finding that the costs it incurred to complete Ragghianti's work were reasonably and necessarily incurred. Ron Hartshorn and Baron Steve White both have extensive experience in estimating work, obtaining concrete pricing and otherwise were intimately familiar with the market for such work in the area around San Angelo, Texas, where the Project was located. Although, Hartshorn and White agreed that some of the pricing to fix Ragghianti's defective work – namely Cantera's - was much higher than Ragghianti's pricing, each provided a reasonable explanation for having to pay a premium price.

Therefore, for the reasons stated above, this Court finds in favor of PRBC on its breach of contract claim.

### 4. **Whether PRBC Can Recover Attorneys' Fees**

Finally, Ragghianti argues that PRBC cannot recover its attorneys' fees even if it prevails on its indemnity or termination for default claims. (Doc. # 161 at 89). "To obtain attorney's fees as actual damages, a plaintiff must show that the claimed attorney's fees were reasonable and necessary." Dixon Fin. Servs., Ltd. v. Chang, 325 S.W. 3d 668, 678. (Tex. App. 2010).

According to PRBC, it has incurred $630,000 in legal fees and paid $580,000 of that amount at trial. (Doc. # 151

at 244). Ragghianti contends that PRBC failed to prove its reasonable attorneys' fees as an element of damages at trial as it offered no relevant witnesses or exhibits; therefore, PRBC is not entitled to recover attorneys' fees on either claim. (Doc. # 161 at 89-90).

At trial, PRBC offered Charles Ernest Edgar to provide testimony on the amount of fees paid to date, the hourly rate, and the reasonableness of those fees based on his experience in procuring legal services in the Tampa, Florida market. (Doc. # 160 at 15). Ragghianti has provided no justifiable basis to exclude this testimony. (Id. at 10).

At trial, Charles Ernest Edgar provided the following testimony:

> Q: Okay. And what's the total amount of legal fees that have been billed to Atkins in this lawsuit?
>
> A: Inception to date through, I believe, the end of December, the figure is around – is approximately $630,000.
>
> Q: And the total paid?
>
> A: Approximately 580,000.
>
> * * *
>
> Q: And do you know what the billing rate is for Mr. Buesing in this case?

75

A.  Yes. $475 an hour, I believe.

Q:  425.

A:  425.

Q:  And [Mr. Vento's] billing rate?

A:  The same.

Q:  All right. And Mr. Kiser's billing rate?

A:  I believe it's 375.

Q:  Okay. And Miss Saunders' billing rate?

A:  175, if I'm not mistaken.

Q:  And do – and you are the general counsel of Atkins and you hire lawyers all the time, correct?

A:  I retain all counsel on behalf of the corporation and I review all level bills on behalf of the corporation.

Q:  And are those hourly rates reasonable and appropriate for this type of case?

A:  They are.

Q:  Okay. And is the amount expended, unfortunately, consistent with the amount of work that had to be done in the case when we had five or six Motions to Compel and all kinds of other things?

A:  The billings are consistent with the work that's been performed.

(Doc. # 151 at 244-246). This Court finds that PRBC – through Charles Ernest Edgar – provided sufficient testimony establishing its entitlement to attorneys' fees and the reasonableness of such fees under the circumstances of this action. The Court notes that Ragghianti has previously attempted to strike Charles Ernes Edgar's testimony (Doc. # 156), and this Court denied Ragghianti's request (Doc. # 168 at 11-13).

## IV. **Conclusion**

For the reasons stated above, the Court finds that PRBC's termination of Ragghianti was one of default. Although Ragghianti seeks damages for unearned lost profits, unabsorbed home office overhead, and increased costs attributable to delay, the express terms of the Subcontract limit Ragghianti's recovery to those damage representing its unpaid furnished labor and materials (i.e., Ragghianti's outstanding balance), totaling $392,000. In addition, the Court finds in favor of PRBC on its indemnity and breach of contract claims. Therefore, the $827,457 in damages PRBC incurred to remove and replace the defective slab and complete Ragghianti's scope of work must be offset by Ragghianti's outstanding balance of $392,000. As a result, PRBC's net total damages amount is $435,457.

To the extent PRBC, as the prevailing party, seeks attorneys' fees and costs in this matter, it has until October 15, 2014, to file an appropriate motion requesting such relief.[5]

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendant Peter R. Brown Construction, Inc.'s Motion to Conform the Pleadings to the Evidence (Doc. # 154) is **DENIED**.

(2)   Peter R. Brown Construction, Inc.'s Motion for Judgment on Partial Findings Pursuant to Fed. R. Civ. P. 52(c) (Doc. # 139) and Plaintiff Ragghianti Foundations III, Inc.'s Motion for Judgment on Partial Findings Pursuant to Fed. R. Civ. P. 52(c) (Doc. # 155) are **GRANTED** to the extent provided herein.

(3)   The Clerk is directed to enter judgment in favor of Peter R. Brown Construction, Inc. in a sum of **$435,457**, and thereafter **CLOSE** this case.

---

[5]   The Court will address PRBC's entitlement to attorneys' fees and costs regardless of whether, at the time PRBC's counsel submits further documents in support of their fee and cost request, this case has been closed by the Clerk.

(4)   Peter  R.  Brown  Construction,  Inc.  has  until  and

including **October 15, 2014**, to file any motions for

attorneys' fees or costs.

**DONE** and **ORDERED** in Chambers in Tampa, Florida this <u>19th</u>

day of September, 2014.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record